650 P.2d 1264
**STATE of Arizona, Appellee,**

v.

**Thomas Bennett WALTON, Appellant.**

**No. 1 CA–CR 5130.**

Court of Appeals of Arizona,
Division 1, Department A.

June 29, 1982.

Rehearing Denied Aug. 6, 1982.

Review Denied Sept. 14, 1982.

Robert K. Corbin, Arizona Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div., and Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Aspey, Watkins & Diesel by Frederick M. Aspey, Flagstaff, for appellant.

## OPINION

OGG, Presiding Judge.

The defendant was convicted of second degree murder while armed, in violation of A.R.S. §§ 13–1104 and 13–604(G), following a trial by jury. He was committed to the Department of Corrections to serve a presumptive term of 10½ years, with credit for 162 days of presentence incarceration. He raises seven issues on appeal:

1. Whether the trial court erred in denying his motion for a new determination of probable cause;

2. Whether the trial court erred in denying the defendant's motion to dismiss based on his claim that A.R.S. §§ 13–1102 through 13–1105 violate equal protection and are void for vagueness;

3. Whether the trial court erred in admitting into evidence photographs of the deceased which the defendant claims were unduly gruesome and prejudicial;

4. Whether the trial court erred in denying the defendant's motion for a judgment of acquittal based on the defendant's claim that the evidence was insufficient to warrant a conviction;

5. Whether the trial court erred in allowing into evidence an x-ray of the rib of the victim and testimony concerning the x-ray by a physician when the defendant asserts that the x-ray had not

been disclosed by the prosecutor prior to trial;

6. Whether the trial court erred in instructing the jury that the defendant would not be subject to the death penalty in the event the jury found the defendant guilty of first degree murder;

7. Whether the sentence imposed by the trial court was excessive.

The defendant was charged by indictment with having committed first degree murder resulting from the shooting death of the victim, Johnny Cordova, during an altercation at the Rose Tree Bar in Flagstaff. The defendant, admitting that he shot the victim, contended that he killed Cordova in self-defense. The state presented its case in support of the first degree murder charge through the testimony of numerous eye witnesses to the offense, various investigating officers, and the county pathologist. A critical issue in the case was the distance between the defendant and the victim at the time of the shooting. In support of his claim of self-defense, the defendant called as witnesses a forensic pathologist, Dr. Benham, and a mathematician, Dr. Moore, who, together, reconstructed the path of the bullet through the body of the victim, calculating the angle of the bullet, and from that, the distance between the victim and the defendant at the time of the shooting. In rebuttal, and over the objection of the defendant, the state introduced into evidence an x-ray of the rib of the defendant and the testimony of the county pathologist to the effect that the bullet fractured the rib and deflected. This testimony in rebuttal tended to contradict the findings of Dr. Benham and Dr. Moore.

The shooting was investigated by Flagstaff police officer Cooper who responded to a call to the Rose Tree Bar at approximately 5:00 p.m. on August 17, 1980. As he entered the bar, Cooper observed the body of the victim lying on the floor near the west wall, and heard people in the bar stating that the defendant had shot the victim. Cooper called an ambulance for transporting the victim to the Flagstaff Community Hospital. The victim was pronounced dead at approximately 5:17 p.m.

Cooper took a statement from Dolly Cordova, the wife of the victim. Dolly told Cooper that her husband was tending bar and that she was sitting on a bar stool when the defendant entered the bar. The defendant approached her and touched her hair, stating what pretty hair she had. The victim told the defendant to stop touching his wife, but apparently the defendant did not heed this request. Dolly told Cooper that her husband walked from behind the bar toward the wall of the bar where he picked up a pool cue and approached the defendant. She stated that the defendant then shot the victim first in either the neck or facial area, causing her husband to turn around. She indicated that her husband walked toward the northwest corner of the pool table and stopped, and that the defendant approached him by several steps, fired his gun, and again shot the victim.

Prior to trial, Dolly Cordova was interviewed by the defendant's counsel and investigator. During the interview she stated that she felt that the defendant was defending himself at the time of the shooting. She said that at the time of the shooting, the victim was holding the pool cue as if it were a baseball bat with which to hit the defendant. She testified at trial that her husband was very jealous and would become violent if she spoke to other men. She related an incident where she had been sitting in the bar speaking to one of the victim's brothers when the victim became jealous and pushed his brother and began hitting her until she was knocked unconscious. She also testified at trial that she was afraid of the family of the victim because they blamed her for the killing and they had threatened to take her children away from her. Finally, at trial, when she was asked whether she thought the defendant had shot the victim in self-defense, she responded: "I don't know."

The state also called other eye witnesses whose testimony varied considerably. One witness testified that the defendant shot the victim twice in the back and that there was an approximately thirty-second inter-

val between the two shots which were fired. The victim was in fact shot once in the face and once in the side. Another witness testified that the shots were less than a second apart. One witness indicated that he saw the victim approaching the defendant and that while the victim was walking fast, he did not appear to be angry or upset. Still another witness indicated that the victim appeared to be extremely angry as he approached the defendant. Dolly Cordova and another witness testified that the defendant was 15 feet from the victim at the time of the shooting. Another witness indicated that the defendant and the victim were ten feet apart at the time of the shooting.

The state's criminalist, Ken Kowalski, conducted tests on gunshot residue found around the hole in the shirt worn by the victim at the time of the shooting. The hole in the shirt was just under the left armpit, and was thus caused by the fatal second shot inflicted by the defendant. Kowalski testified that as a result of his test, he was able to determine that the gunshot wound was not a contact or near contact wound, which he defined as six inches or less from the victim. He also testified that the tests established that the shots could not have been fired from a distance greater than nine to ten feet from the victim. The defense called Dr. Moore, a mathematician from Northern Arizona University, who calculated the distance between the victim and the defendant at the time of the shooting as between 3.8 feet to 5 feet based upon the angle of the path of the bullet through the body. Dr. Moore did indicate that his calculations could vary if the victim were not standing upright at the time of the shooting.

The evidence also revealed that immediately after the shooting, the defendant left the Rose Tree Bar on foot and proceeded toward the police station. He was picked up by Officer Tullis in a patrol vehicle and transported to the Flagstaff police station where the officer advised the defendant of his *Miranda* rights. The defendant agreed to make a statement to the police officers. He told them that he and his friend, Keith, went to the Rose Tree Bar to have a couple of drinks and play some pool. When the defendant entered the bar, he saw a pretty girl sitting there and he walked up to her and said, "Hello, pretty lady", and touched her on the shoulder. The victim told him not to touch his girl, and the defendant moved away from the girl stating, "I'm sorry, I just said hello." The defendant indicated that the victim then broke from behind the bar, ran around the bar, and grabbed a pool cue from the cue rack. The defendant told the officers that he shot the victim twice to keep him from hitting him with the pool cue. He stated that he did not aim, but that he just shot. He also indicated that he did not want to shoot the victim, but that he had been hit in the head several years before with a pool cue and had recurring problems as a result of his injuries. An intoxilyzer test indicated that the defendant's blood alcohol reading was .06, and a subsequent blood test showed that his blood alcohol reading was .15. The defendant's statement to the police was tape recorded, and the recording was played for the jury.

## THE GRAND JURY PROCEEDINGS

■ Defendant first contends that the trial court erred in denying his motion for a new finding of probable cause made pursuant to Rule 12.9(a), Rules of Criminal Procedure, 17 A.R.S. He argues that the police officer testified to inaccurate and misleading information which led the grand jurors to believe that the defendant was not intoxicated at the time of the offense. He further argues that the prosecutor misstated the law concerning the element of premeditation required for first degree murder.

Before issuing a true bill charging the defendant with first degree murder on August 21, 1980, the Coconino County Grand Jury heard the testimony of Detective James of the Flagstaff Police Department. James related the defendant's statement to the grand jury and also related the statements of other witnesses to the shooting which differed from the defendant's ver-

sion. Detective James responded to a question from a grand juror that the defendant's breathalyzer results showed that the defendant had a blood alcohol of .06, with .10 as the presumptive level for one to be under the influence of alcoholic beverages. Detective James did not introduce evidence of the blood alcohol test because the results of that test had not been received by him at the time of the grand jury proceedings.

Following Detective James' testimony, the prosecutor presented to the foreman a proposed form of indictment charging the defendant with first degree murder. At that time, a grand juror asked the prosecutor to read the definition of premeditation. The prosecutor read to the grand jury the definition of premeditation in A.R.S. § 13–1101, and also told the grand jury that premeditation could be "as instantaneous as the conscious thoughts of the human mind." The defendant contends that this instruction was from a case decided under the old code and has no application to the concept of premeditation defined under the current criminal code.

■ We need not determine the propriety of withholding evidence from a grand jury or the propriety of the instructions to a grand jury on an appeal from a subsequent conviction. *State v. Verive,* 128 Ariz. 570, 627 P.2d 721 (App.1981); *State v. Neese,* 126 Ariz. 499, 616 P.2d 959 (App.1980). The trial jury, after the full trial and the presentation of the results of both the intoxilyzer and the blood tests, and after being completely and accurately instructed on the elements of all degrees of homicide, found the defendant guilty of second degree murder beyond a reasonable doubt. This court has held that in such circumstances, in order to obtain review of the denial of the motion for a new finding of probable cause, a defendant must seek relief by way of special action prior to trial. A defendant may not by an appeal from a conviction obtain review of matters relevant to a determination of probable cause which had no effect on the subsequent trial. *State v. Verive, supra; State v. Neese, supra.*

## MOTION TO DISMISS

Prior to trial, the defendant filed a motion to dismiss the indictment, challenging the constitutionality of the first degree murder, second degree murder, manslaughter and negligent homicide statutes, A.R.S. §§ 13–1102 through 13–1105. The defendant asserted that the statutes overlap, are unconstitutionally vague, and constitute a denial of equal protection. The trial court denied the motion to dismiss, and at trial, instructed the jury on the elements of first degree murder, second degree murder, manslaughter and negligent homicide. The trial court also instructed the jury on the states of mind of intentionally, knowingly, recklessly, and negligently, pursuant to A.R.S. § 13–105.

■ Due process requires that criminal offenses be defined in terms of sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute because a person should not be required, at the risk of his liberty, to speculate as to the meaning of a criminal statute. *State v. Limpus,* 128 Ariz. 371, 625 P.2d 960 (App. 1981). Equal protection of the laws guarantees like treatment to all persons who are similarly situated; however, the Fourteenth Amendment does not deny a state the power to classify in the adoption of police law, and a legislative classification will not normally be set aside if any set of facts rationally justifying it is demonstrated to or perceived by the courts. *State v. Kelly,* 111 Ariz. 181, 526 P.2d 720 (1974), *cert. denied* 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975). Thus, "[a] statute which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the laws." *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316, 318 (1975). A statute which is defined in terms so vague as to render it incomprehensible to a person of ordinary intelligence violates due process. *State v. Limpus, supra.*

The defendant asserts in this case that the homicide statutes, A.R.S. §§ 13–1102 through 13–1105 violate both due process, as being void for vagueness, and equal protection as creating distinctions without a difference in the classification of the various degrees of homicide. In analyzing the statutes in this case, this court must keep in mind certain principles of review. First, the courts do not demand mathematical precision from the legislature, and there is a strong presumption supporting the constitutionality of a legislative enactment. *State v. Arnett,* 119 Ariz. 38, 579 P.2d 542 (1978); *State ex rel. Williams v. City Court,* 21 Ariz.App. 318, 519 P.2d 71 (1974). Thus, the burden rests on the party challenging the validity of a statute to establish that it is unconstitutional. *State v. Yabe,* 114 Ariz. 89, 559 P.2d 209 (App.1977).

The defendant first asserts that the second degree murder statute under which he was convicted is unconstitutional in that the requirement to sustain a conviction under that statute is indistinguishable from the requirement to sustain a conviction for first degree murder with premeditation pursuant to A.R.S. § 13–1105(A)(1).[1] A.R.S. § 13–1105(A)(1) provides:

A. A person commits first degree murder if:

1. Knowing that his conduct will cause death, such person causes the death of another with premeditation;

\* \* \* \* \* \*

A.R.S. § 13–1101(1) defines premeditation as follows:

"Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

As Judge Gerber points out in his treatise, " 'Premeditation' is the distinguishing feature of first degree murder. Its essence is reflective intent to kill. Premeditation requires some 'length of time' sufficient to permit the defendant to reflect on what he is about to do." R. Gerber, *Criminal Law of Arizona* at 147 (1978).

The defendant asserts that first degree murder with premeditation is impossible to distinguish from either intentional or knowing second degree murder as defined in A.R.S. § 13–1104(A)(1) and (2). That statute states:

A. A person commits second degree murder if without premeditation:

1. Such person intentionally causes the death of another person; or

2. Knowing that his conduct will cause death or serious physical injury, such person causes the death of another person;

\* \* \* \* \* \*

The culpable mental states of intentionally and knowingly are defined in A.R.S. § 13–105(5)(a) and (b) as follows:

(a) "Intentionally" or "with the intent to" means, with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct.

(b) "Knowingly" means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists.

It is apparent from a reading of A.R.S. § 13–1105 in conjunction with A.R.S. § 13–1104 that first degree murder requires a showing of premeditation, while second degree murder requires a showing that the offense was committed intentionally or

---

1. The state argues that the defendant has no standing to attack the constitutionality of A.R.S. § 13–1105(A)(1) because he was not convicted of first degree murder. We disagree. The defendant was convicted of second degree murder and he attacks the constitutionality of A.R.S. § 13–1105(A)(1) as it relates to second degree murder. Inherent in his equal protection claim with regard to A.R.S. § 13–1104 is an assertion of the unconstitutionality of A.R.S. § 13–1105(A)(1). We conclude therefore that the defendant has standing to raise this issue.

knowingly but without premeditation.[2] It is thus clear that the legislature intended that there be two grades of murder with premeditation as the distinguishing factor between first and second degree murder. *See People v. Sneed,* 183 Colo. 96, 514 P.2d 776 (1973). While there may not appear to be a great difference between premeditated first degree murder and intentional or knowing second degree murder, and while the distinction between the two may be difficult to apply, there still exists a perceptible measure of difference in that premeditation must precede the killing "by a length of time to permit reflection." In construing premeditation under the prior criminal code, the Arizona Supreme Court quoted the following instruction as a correct statement of the law:

> In order to find a deliberate and premeditated killing you must find more reflection on the part of the defendant than is involved in the mere formation of the specific intent to kill.

*State v. Magby,* 113 Ariz. 345, 352, 554 P.2d 1272, 1279 (1976).

In light of the definition of premeditation in the current criminal code, it is apparent that *State v. Magby* has continuing utility, and thus, it is this period of reflection, regardless of the length of time of the reflection, which distinguishes first degree murder from intentional or knowing second degree murder.[3] We conclude, therefore, that A.R.S. §§ 13–1105(A)(1) and 1104(A)(1) and (2) do not violate equal protection inasmuch as there is a perceptible measure of difference between the statutes. We also conclude that a person of ordinary intelligence can perceive the distinctions between first degree murder and second degree murder, and that therefore, the statutes are not unconstitutionally vague.

 The defendant also asserts that A.R.S. § 13–1104(A)(3), defining reckless

second degree murder and A.R.S. § 13–1103(A)(1), defining reckless manslaughter violate equal protection because they are indistinguishable, and that they violate due process because they are void for vagueness. A.R.S. § 13–1104(A)(3) provides:

> A. A person commits second degree murder if without premeditation:
>
> \* \* \* \* \* \*
>
> 3. Under circumstances manifesting extreme indifference to human life, such person recklessly engages in conduct which creates a grave risk of death and thereby causes the death of another person.

A.R.S. § 13–1103(A)(1) provides:

> A. A person commits manslaughter by:
>
> 1. Recklessly causing the death of another person.

The culpable mental state of "recklessly" is defined in A.R.S. § 13–105(5)(c) as follows:

> (c) "Recklessly" means, with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware of such risk solely by reason of voluntary intoxication also acts recklessly with respect to such risk.

Thus, manslaughter pursuant to A.R.S. § 13–1103(A)(1) is committed where a person has no homicidal intentions but causes death recklessly. The culpable mens rea of *recklessly* consists of a conscious disregard of a substantial and unjustifiable risk. The risk required for conviction of manslaugh-

---

**2.** A.R.S. § 13–1104(A)(3) also provides that second degree murder may be committed recklessly, but the defendant does not argue that reckless second degree murder is indistinguishable from first degree murder.

**3.** The Criminal Code Commission's draft defining premeditation provided: "when such intention or knowledge precedes the killing by an *appreciable* length of time to permit reflection." (emphasis added). *See* R. Gerber, *supra* at 147. The legislature adopted the Code Commission draft except it deleted the word "appreciable".

ter must involve "a gross deviation from the standard of conduct that a reasonable person would observe in the circumstances." However, for one to commit second degree murder pursuant to A.R.S. § 13–1104(A)(3), the legislature has established a more culpable mental state. In commenting on reckless manslaughter in comparison with reckless second degree murder, Judge Gerber states:

In treating this situation expressly as manslaughter, this section reflects a judgment that the culpable mental state of extreme indifference in new A.R.S. § 13–1104(A)(3) is greater in degree of criminality than the culpable mental state involved here.

R. Gerber, *supra,* at 152.

■ The Criminal Code Commission points out in its committee notes that the extreme indifference to human life involved in reckless second degree murder distinguishes reckless second degree murder "from the less culpable recklessness involved in" reckless manslaughter. Arizona Revised Criminal Code, Arizona Criminal Code Commission at 128 (1975). The commission points out that "shooting into a crowded room or derailing a speeding train may be examples of [the] excessive recklessness" required for reckless second degree murder. *Id.* Accordingly, while manslaughter requires only a showing of recklessness, reckless second degree murder requires also a showing of "extreme indifference to human life" which created a "grave risk of death" to another in addition to the requirement of recklessness. Clearly then, two distinct measures of care differentiate the condition of recklessness expressed in the two statutes, and an extreme indifference creating a grave risk of death to another is a more culpable mental state than the requirement of a conscious disregard of a substantial and unjustifiable risk. *See, e.g., People v. District Court,* 185 Colo. 78, 521 P.2d 1254, 1257 (1974), where the Colorado Supreme Court held that "an extreme indifference to human life is clearly a more culpable standard of conduct [than recklessly], especially where necessarily coupled with the additional requirement that there

be created a *grave* risk of death." (emphasis in original).

■ The defendant also argues that reckless manslaughter as defined in A.R.S. § 13–1103(A)(1) is indistinguishable from negligent homicide, which is defined as follows:

A person commits negligent homicide if with criminal negligence such person causes the death of another person.

A.R.S. § 13–1102(A).

The culpable mental state of criminal negligence is set forth in A.R.S. § 13–105(5)(d) as:

(d) "Criminal negligence" means, with respect to a result or to a circumstance described by a statute defining an offense, that a person fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

Thus, negligent homicide is established when a person fails to perceive a substantial and unjustifiable risk, and when the failure to perceive the risk is a gross deviation from the standard of care which a reasonable person would observe. Negligent homicide is distinguished from reckless manslaughter in that for the latter offense, the defendant is aware of the risk of death and consciously disregards it, whereas, for the former offense, he is unaware of the risk. *See* R. Gerber, *supra,* at 150.

■ We conclude, therefore, that two distinct states of mind differentiate reckless manslaughter from negligent homicide. The legislature obviously intended that the awareness of the risk be a meaningful distinguishing factor between the two offenses. Accordingly, we find that the statutes defining reckless manslaughter and negligent homicide do not violate the equal protection clause of the Constitution.

■ The defendant argues, nevertheless, that all the homicide statutes herein

discussed are void for vagueness and therefore violative of the due process clause of the Constitution. This due process claim hinges exclusively on the equal protection claim inasmuch as the sole thrust of the defendant's due process argument is that because the statutes are indistinguishable for equal protection purposes, they are, *a fortiori,* void for vagueness. He does not argue that the statutes are void for vagueness in any other regard. While the homicide offenses necessarily overlap to some degree, we have concluded that there are readily perceptible distinctions between each grade of homicide discussed herein. It follows, therefore, that the defendant's due process claim must likewise fail.

## ADMISSION OF PHOTOGRAPHS

The defendant contends that the trial court erred in admitting into evidence various photographs of the deceased based on his claim that the photographs were inflammatory and cumulative. The defendant objected at trial to the admission of the photographs as being both inflammatory and cumulative, and the trial court sustained the objection as to four of the photographs but allowed eight photographs into evidence.[4] The defendant argues that the photographs were "sordid, gruesome and depicted the deceased in an inflammatory manner" and that it was reversible error for the trial court to allow them into evidence particularly since the defendant never denied that he shot the deceased.

We disagree. Even though the defendant did not deny that he shot the deceased, his defense at trial was self-defense, and the most heavily contested issue at trial was the distance between the victim and the defendant at the time of the shots. Both the angle of the bullet as it entered and traveled through the body, and the presence or absence of powder burns or "tattooing" at the entrance wound were relevant to the determination of the dis-

tance between the victim and the defendant at the time of the shooting. It was established by testimony that an elliptical entrance wound, as opposed to a round entrance, would indicate an acute angle of entry of the bullet. Therefore, the photographs were probative on the issue of distance. Moreover, another factual issue was whether the victim had been shot in the back or in the side. The photographs tended to show that the victim had been shot in the side. Therefore, the photographs were directly relevant to and helped clarify the factual issues presented to the jury.

The admissibility of arguably gruesome photographs is a question addressed to the discretion of the trial court, and depends on whether the probative value is outweighed by the prejudicial effect of their admission. *State v. Steele,* 120 Ariz. 462, 586 P.2d 1274 (1978). Thus, where it appears that the sole purpose of introducing a gruesome photograph or an article of clothing is to prejudice the jury, the admission of such items is reversible error. *Id.* However, it is clear that the photographs introduced in this case were directly probative on the defendant's claim of self-defense, and our review of those photographs leads us to conclude that they were not so inflammatory as to outweigh their probative value. We find no error.

## DENIAL OF THE MOTION FOR JUDGMENT OF ACQUITTAL

For his next argument, the defendant contends the trial court erred in denying his motion for a judgment of acquittal based on his claim that the evidence is insufficient to support the conviction. *State v. Sety,* 121 Ariz. 354, 590 P.2d 470 (App.1979).

On appeal, this court must view the evidence in a light most favorable to sustaining the jury verdict. *State v. Acree,* 121 Ariz. 94, 588 P.2d 836 (1978). The trial court may grant a judgment of acquittal

4. Although the state contends that the defendant has waived his objection as to the inflammatory nature of the photographs, the record reveals that the defendant objected to the pho-

tographs not only because they were cumulative but also on the grounds that "they have no effect but to attempt to inflame the jury."

pursuant to Rule 20, Rules of Criminal Procedure, 17 A.R.S., only if there is "no substantial evidence to warrant a conviction." The trial court is under no obligation to grant a motion for a judgment of acquittal where there is substantial evidence that the defendant has committed the crime charged, and the trial court should not grant a motion for a judgment of acquittal if reasonable minds can differ on the inferences to be drawn from the evidence. *State ex rel. Hyder v. Superior Court,* 128 Ariz. 216, 624 P.2d 1264 (1981). " 'Substantial evidence' is evidence that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Jones,* 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980). Moreover, it is the duty of the jury to resolve conflicts in the evidence. *Id.*

■ We have reviewed the record and find there is substantial evidence to sustain the conviction. We therefore find that the trial court did not err in denying the motion for a judgment of acquittal.

## REBUTTAL EVIDENCE OF X–RAY

At the close of the defendant's case, he moved *in limine* to preclude the state from introducing into evidence a rib and an x-ray of the rib taken from the victim. The basis for the objection was that the x-ray and rib had not been disclosed to the defendant prior to trial and that a proper foundation had not been established for the admission of the x-ray or the rib. The trial court denied the motion and admitted the x-ray. Following the trial court's ruling, Dr. Vorpahl, the pathologist who performed the autopsy, testified that it was his opinion from looking at the x-ray that the bullet ricocheted off the 7th and 8th ribs of the victim after having entered the body at the level of the 5th and 6th ribs. Based on this testimony, the state argued that Dr. Benham could not have accurately calculated the angle of the path of the bullet through the body of the victim. On appeal, the defendant argues that the admission of the x-ray of the rib was reversible error because the x-ray had not been disclosed to the defense at any time prior to trial.

The record reveals that Dr. Vorpahl had testified during the state's case-in-chief that he believed that the bullet had cracked the rib in question and ricocheted off it. Dr. Vorpahl's name and address had been disclosed to the defendant prior to trial, and indeed, the defendant noticed Dr. Vorpahl as one of his own witnesses well prior to trial. Approximately a week before trial, the defense gave notice that it intended to call Dr. Moore concerning his calculations of the distance between the victim and the defendant at the time of the shooting based on the angle of the bullet through the body. During the trial, the state had the rib in question x-rayed. Dr. Vorpahl testified at the motion *in limine* that it was standard procedure during an autopsy to retain portions of tissue along the track of a bullet, and that he had saved the rib pursuant to that practice. He further indicated that he had spoken with defense counsel two to three times prior to trial, but he had not disclosed to them that he had saved the rib because neither defense counsel asked and because the condition of the rib was not an issue until Dr. Moore's testimony. Based on the foregoing, the trial court allowed the state to introduce the x-ray, and indicated that the defendant could move to allow Dr. Benham to examine the rib and testify in surrebuttal, and that the court would consider such a motion at the time it was made. The defendant did not move to allow Dr. Benham to examine the rib and present his conclusions at any time thereafter.

■ Rule 15.1(f), Rules of Criminal Procedure, 17 A.R.S., provides:

Upon receipt of the notice of defenses required from the defendant under rule 15.2(b) the state shall disclose the names and addresses of all persons whom the prosecutor will call as rebuttal witnesses together with their relevant written or recorded statements.

With regard to the application of rule 15.1(f), the supreme court has expressly stated that the listing of the names of witnesses for use in the state's case-in-chief is adequate notice to the defendant to be prepar-

ed for their testimony at any time, and such testimony may be admitted on rebuttal. *State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040 (1977). Further, this court has stated:

> The criminal discovery rules do not require the state to provide a word-by-word preview to defense counsel of the testimony of the state's witnesses.

*State v. Wallen,* 114 Ariz. 355, 361, 560 P.2d 1262, 1268 (App.1977); *see also, State v. Guerrero,* 119 Ariz. 273, 580 P.2d 734 (App. 1978).

While the state did not specifically disclose the existence of the rib and the x-ray of the rib until the x-ray was made during trial, it is clear that the x-ray evolved out of the testimony of the late disclosed defense witnesses, in particular, Dr. Moore. Where, as here, the defense witness was not disclosed until a week prior to trial, we conclude that imposing the sanction of preclusion of the rebuttal testimony would be unnecessarily harsh. *See* Rule 15.7(a)(4), Rules of Criminal Procedure, 17 A.R.S.; *State v. Smith,* 123 Ariz. 243, 599 P.2d 199 (1979). The defendant was given an opportunity to question the physician witnesses prior to the admission of the x-ray. He was also given an opportunity to move to allow Dr. Benham to examine the rib and the x-ray, which he failed to do. Under these circumstances, we cannot fault the prosecutor for failing to anticipate that the angle of the bullet through the body would be at issue. We find no error in the ruling of the trial court admitting the x-ray. *State v. Lewis,* 121 Ariz. 155, 589 P.2d 29 (App.1978).

## INSTRUCTION REGARDING DEATH PENALTY

The defendant next asserts that the jury should not have been instructed concerning a stipulation that the death penalty would not be sought regardless of the verdict. Prior to trial, the following stipulation was entered into between the defendant, his counsel, and the prosecutor:

> The State of Arizona, by and through the undersigned Deputy County Attorney and the Defendant Thomas Bennett Walton, by and through his attorney Frederick M. Aspey, hereby stipulate and agree that the defendant will not receive the death penalty in this case in the event that the jury returns a verdict of guilty on the charge of first degree murder.
>
> IT IS FURTHER STIPULATED and agreed by and between the parties herein that the Court shall inform the prospective jurors of this stipulation at the time of jury selection.
>
> IT IS FURTHER STIPULATED and agreed by and between the parties herein that at the time of trial the jury shall be instructed by the Court that irrespective of the verdict, the Defendant will not be subject to the death penalty.

During jury selection the jury panel was told by the trial court that if the defendant were convicted of first degree murder, the death penalty would not be sought. At the conclusion of the evidence, the jury was also instructed as follows:

> You were instructed that if you return a verdict of guilty on the charge of First-Degree Murder, the Defendant will not be subject to the death penalty.
>
> In deciding whether the Defendant is guilty or not guilty, do not consider the possible punishment.

Defense counsel signed the stipulation at the insistence of the defendant, but during the settling of the instructions, he objected to the death penalty instruction on the grounds that punishment was not an issue for the jury.

In *State v. Van Dyke,* 127 Ariz. 335, 337–38, 621 P.2d 22, 24–25 (1980), in addressing this issue, our supreme court stated:

> It is true a defendant is entitled to a jury verdict based on the evidence and without regard to the possible punishment, but here, by agreement of the parties, the jury was informed that no death sentence would be rendered. It was not only proper according to the very terms of the stipulation to "instruct" the jury but necessary to direct that this stipulation was to play no part in its delibera-

tions. Further, it was important to let this jury know how to deal with this particular stipulation in regard to all other stipulations. (citation omitted).

We find that *Van Dyke* is dispositive of the issue in this case. Further, we note that the defendant in *Van Dyke* was found guilty of two counts of first degree murder, and that therefore any claim of prejudice resulting from the allegedly improper instruction with regard to the penalty for first degree murder would certainly be more persuasive in that case than in this case where the defendant was found guilty not of first degree murder, but of second degree murder. Under these circumstances, it appears clear that the instruction had no effect on the verdict of the jury. We find no error.

### SENTENCE

For his last issue, the defendant contends that the trial court imposed an excessive sentence and requests this court to invoke its authority pursuant to A.R.S. § 13–4037(B) to modify the defendant's sentence. The record reveals that both the defendant and the state requested a presentence hearing, the defendant for the purpose of presenting mitigating testimony, and the state for the purpose of presenting aggravating testimony. Numerous witnesses appeared at that hearing and testified for the defense, as to the defendant's peaceful, loving and law-abiding nature, and for the state, as to the defendant's known violent propensities. The trial court heard all of the testimony and read the presentence report. Prior to imposing the presumptive term, the trial court found the following aggravating circumstances:

(I) The defendant has an extensive prior arrest history;

(II) That the defendant has been arrested for several offenses involving the use of weapons;

(III) As found by the jury, the crime did result from the use of a deadly weapon.

The trial court also found the following mitigating circumstances:

(I) The defendant's age of 63 years;

(II) The fact that the defendant was intoxicated at the time the offense was committed;

(III) The defendant does not have a prior felony conviction;

(IV) The defendant cooperated with law enforcement agencies from the time of his arrest;

(V) The defendant appears to be sincerely remorseful for what occurred;

(VI) There was evidence of provocation and the need for self-defense, although the jury did not find this evidence to be sufficient to justify an acquittal or to justify finding the defendant guilty of the lesser offense.

The trial court found that the aggravating and mitigating circumstances were not sufficient to call for a greater or lesser term than the presumptive term, and ordered the defendant committed to the Department of Corrections for the presumptive term of 10½ years with credit for presentence incarceration of 162 days.

The defendant argues on appeal that since the trial court found six mitigating factors and only three aggravating factors, it is difficult to understand how the trial court could have imposed the presumptive term. The defendant also asserts that in view of his age, the sentence imposed may very well end up to be a death sentence. We find these contentions insufficient to compel us to invoke our authority pursuant to A.R.S. § 13–4037(B), to reduce the defendant's sentence.

The balancing of the aggravating and mitigating circumstances in determining a sentence is not based upon mere numbers of aggravating or mitigating circumstances. *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979); *State v. Henderson*, 133 Ariz. 259, 650 P.2d 1241 1982); *State v. Marquez*, 127 Ariz. 3, 617 P.2d 787 (App.1980). It is the duty of the trial court to "take into account the amount of aggravating circumstances and whether the amount of mitigating circumstances is sufficiently substantial to call for the lesser term." A.R.S. § 13–702(E). When a sen-

tence is within statutory limits, it will not be modified or reduced on appeal unless, from the circumstances, it clearly appears that the trial court abused its discretion in imposing sentence. *State v. LaMountain,* 125 Ariz. 547, 611 P.2d 551 (1980). An abuse of discretion is characterized by capriciousness or arbitrariness or by a failure to conduct an adequate investigation into the facts necessary for an intelligent exercise thereof. *State v. Patton,* 120 Ariz. 386, 586 P.2d 635 (1978).

It is clear that the trial judge carefully exercised his discretion in determining the sentence in this case. The trial court noted that the case was a particularly difficult one for purposes of sentencing, and our review of the record leads us to appreciate the trial court's difficulties in imposing sentence in this case. While the presentence report recommended a mitigated term of eight years, it is clear to this court that the trial court carefully considered the defendant's character and background and the nature of the offense itself, and rejected after due deliberation the recommendation of the presentence report.

The trial court's deliberation in this case reflects a meaningful exercise of discretion, and we find no abuse thereof.

For the foregoing reasons, the judgment and sentence are affirmed.

FROEB and CORCORAN, JJ., concur.