NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

THOMAS LAMONT MOTON, *Appellant.*

No. 1 CA-CR 13-0748
FILED 12-30-14

Appeal from the Superior Court in Maricopa County
No. CR2012-127763-001
The Honorable Dawn M. Bergin, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Office of the Legal Advocate, Phoenix
By Consuelo M. Ohanesian
*Counsel for Appellant*

Thomas Lamont Moton, Florence
*Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Peter B. Swann delivered the decision of the Court, in which Judge Kenton D. Jones and Judge Michael J. Brown joined.

---

**S W A N N**, Judge:

¶1         Defendant Thomas Moton appeals his conviction and sentence for first-degree murder.

¶2         This case comes to us as an appeal under *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). Defendant's appellate counsel has searched the record on appeal and found no arguable, non-frivolous question of law, and asks us to review the record for fundamental error. *See Anders*, 386 U.S. 738; *Smith v. Robbins*, 528 U.S. 259 (2000); *State v. Clark*, 196 Ariz. 530, 537, ¶ 30, 2 P.3d 89, 96 (App. 1999). Defendant has filed a supplemental brief *in propria persona* in which he raises several issues for appeal. We have searched the record and considered the issues raised by Defendant. We affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶3         In June 2012, Defendant was indicted on one count of first-degree murder for shooting and killing T.B., the mother of two of his children. Defendant pled not guilty and the matter proceeded to a jury trial.

¶4         At trial, the state presented evidence of the following facts. Defendant and T.B. had an ongoing romantic relationship that led to the birth of their first child about 20 years ago. They lived together in Phoenix for some time and eventually had a second child. Ultimately, T.B. moved out, and she and Defendant maintained an on-and-off relationship. Defendant and T.B. had an informal agreement that Defendant would have "custody" of their youngest child, son D.B., during the week, and T.B. would have "custody" on the weekends. Eventually T.B. began seeing another man; she planned to move to Texas with him without telling Defendant, taking her three children, including D.B. In the days leading up to the shooting, tensions escalated between T.B. and Defendant.

¶5         Six days before the shooting, T.B. was out with friends when her daughter, L.B., came home from a party to find Defendant pulling into the driveway of T.B.'s house. Defendant wanted to know where T.B. was; he went into the house and checked all of the rooms looking for her. Defendant stayed at

the house all night waiting for T.B., but T.B. never came home.  The next morning, Defendant sent T.B. the following text message:

> Yeah, what's up.  Just couple nights ago, you were telling me to call or stop by any time.  Then the first time I do, all bad. But I'm glad I did, you reminded me of the real [T.B.], the low down dirty, bald headed bitch. . . .  Remember, I got all your info, dumb ho . . . .  It's cool.  I'll see you, I promise you dat.  So keep this for your records and choke on a dick, bitch.

After receiving this text, T.B. told L.B. that they were not going to stay at the house anymore and asked L.B. to gather as many belongings as she could and put them in the car.

¶6            Three days before the shooting, L.B. was graduating from high school.  Defendant was not going to allow D.B. to attend the graduation.  To get around Defendant, T.B. and L.B. went to D.B.'s school and signed him out without Defendant's permission so he could attend.  For the next two nights, T.B. and her children stayed with friends and did not inform Defendant of their whereabouts.  T.B. never returned D.B. to school or to Defendant; she was going to keep D.B. with her so he could   also attend the eighth-grade promotion of T.B.'s middle daughter, C.B.   T.B. planned on driving to Texas with all three children immediately after the promotion.

¶7            The eighth-grade promotion, and ultimately the shooting, took place at Westview High School in Avondale.  T.B. was nervous about going to the promotion, believing Defendant might try and find her there, so she decided they would leave right after C.B.'s name was called.  After C.B.'s name was called, the family walked out of the ceremony and T.B. asked a security guard from the school to escort them to the car.  Meanwhile, Defendant had driven to the school, parked his motorcycle, and waited on one of the athletic fields with a view of the parking lot.  As T.B. and the rest of the family walked through the parking lot towards the car, Defendant was seen crouching down and apparently trying to conceal himself from view.  Once the family got closer to T.B.'s car, Defendant ran towards them.  The security guard who had been walking with the family spotted Defendant and pointed him out.  The family ran to the car; T.B. got into the driver's seat, D.B. into the backseat.  Defendant stood in front of the car and pointed a gun at T.B through the windshield.  She tried to start the car but it did not start.  Defendant moved to the driver's side window, yelled "give me my fucking son," shot T.B. at least three times, and fled.  T.B. died at the scene due to massive blood loss from these injuries.

¶8            For his case, Defendant did not testify nor did he present any evidence. He did not dispute that he shot the victim; instead he argued that the killing was not premeditated, and therefore, he should not be convicted of first-degree murder.

¶9            After considering the evidence and hearing closing arguments, the jury found Defendant guilty of first-degree murder. The court entered judgment on the jury's verdict and sentenced Defendant to natural life with no possibility of release, with credit for 503 days of presentence incarceration. Defendant timely appeals.

**DISCUSSION**

I.      DEFENDANT'S ARGUMENTS DO NOT IDENTIFY ERROR.

¶10          In his supplemental brief, Defendant contends that the state and the trial court acted improperly in several respects. We address each in turn.

        A.      Defendant Was Not Entitled to Substitute Counsel.

¶11          Two months before his trial for first-degree murder, Defendant filed a motion with the court to change counsel. The trial court asked Defendant why he wanted new counsel, and he cited "irreconcilable differences and incompetent litigation" as his reasons. The court explained that it was not up to Defendant to determine whether there were irreconcilable differences, and stated that there has to be an absolute and complete breakdown in communication for that to be the case. When the trial court asked Defendant if he could be more specific about his concerns, Defendant stated that his counsel had not looked out for his best interest and that his case was too much for his counsel to handle. The court replied that Defendant's counsel was representing him more than adequately and that counsel was very familiar with Defendant's case. Ultimately, the trial court found that Defendant was being very vague and that there was no basis to give Defendant a new lawyer at that time.

¶12          "A trial court's decision to deny the request for new counsel will not be disturbed absent an abuse of discretion." *State v. Cromwell*, 211 Ariz. 181, 186, ¶ 27, 119 P.3d 448, 453 (2005). A Defendant is not "entitled to counsel of choice, or to a meaningful relationship with his or her attorney." *State v. Moody*, 192 Ariz. 505, 507, ¶ 11, 968 P.2d 578, 580 (1998); *see Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). However, "[t]he presence of an irreconcilable conflict or a completely fractured relationship between counsel and the accused ordinarily requires the appointment of new counsel." *Cromwell*, 211 Ariz. at 186, ¶ 29, 119 P.3d at 453. The trial court did not abuse its discretion in denying Defendant's motion to change counsel. The court conducted an adequate inquiry into why Defendant wanted to change

counsel, Defendant was unable to demonstrate any real conflict between himself and counsel, and from the record, none is discernable. The motion was properly denied.

¶13        Additionally, Defendant now argues that he should have been provided new counsel because his trial counsel refused to call certain witnesses to testify, refused to obtain certain documents to present at trial, and refused to file certain motions at Defendant's direction. These are claims of ineffective assistance of counsel. We do not consider such claims on direct appeal; they must instead be raised in a petition for post-conviction relief under Ariz. R. Crim. P. 32. *See State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9, 39 P.3d 525, 527 (2002).

B.        The Trial Court's Exclusion of an Order of Protection Was Not Error.

¶14        Defendant next contends that the trial court improperly excluded from trial a piece of evidence in violation of his right to due process. Specifically, he states that his attorney told him that the trial court precluded an order of protection that T.B. had against Defendant from admission into evidence. Defendant argues that he could have used the order of protection to impeach the deceased victim's hearsay statements. Defendant now contends that the exclusion of this evidence prevented him from testifying because he "did not feel comfortable" without it. And he argues that because he did not testify, the jury found him guilty of first-degree murder.

¶15        From the record we cannot say whether the trial court actually excluded this evidence, and there is no indication that trial counsel ever attempted to have it introduced. Normally, "[a]n appellate court 'will not disturb a trial court's rulings on the admission or exclusion of evidence unless [the court] finds a clear abuse of discretion and resulting prejudice, or finds that the trial court misapplied the law.'" *State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 297, ¶ 15, 321 P.3d 454, 462 (App. 2014) (quoting *Lohmeier v. Hammer*, 214 Ariz. 57, 61, ¶ 7, 148 P.3d 101, 105 (App. 2006)). Because there is no record of an attempt to introduce this evidence at trial, we cannot say that the court misapplied the law.

¶16        Further, Defendant was given an opportunity to testify before closing and declined to do so. "[A] defendant must make his desire to testify known at trial and cannot allege this desire as an afterthought." *State v. Gulbrandson*, 184 Ariz. 46, 65, 906 P.2d 579, 598 (1995). The trial court has no duty to ensure that a defendant "feels comfortable" enough to testify. Because Defendant never made it clear at any time that he wanted to testify, there was no error in this regard.

C.     Defendant's Claims of Prosecutorial Misconduct Are Unsupported.

¶17     Defendant next contends that the state violated Ariz. R. Crim. P. 15.1 by failing to disclose two exhibits (exhibits 146 and 147) containing security footage from the parking lot where Defendant shot T.B., depriving him of his ability to prepare for trial.

¶18     Rule 15.1 requires that the prosecutor make available to the defense certain material and information within his or her control.  *See* Ariz. R. Crim. P. 15.1(a).  "The underlying principle of Rule 15 is adequate notification to the opposition of one's case-in-chief in return for reciprocal discovery so that undue delay and surprise may be avoided at trial by both sides."  *State v. Lawrence*, 112 Ariz. 20, 22, 536 P.2d 1038, 1040 (1975); *State v. Stewart*, 139 Ariz. 50, 59, 676 P.2d 1108, 1117 (1984).  Defendant provides no support for his contentions that the state failed to disclose any material or information to the defense.  The record shows that defense counsel had no objection to the admission of the "undisclosed exhibits" into evidence at trial.  We note that defense counsel cross-examined the witness, laying the foundation for the exhibits, and demonstrated that he had watched the videos and was very familiar with their contents.

¶19     Defendant also asserts that the state engaged in prosecutorial misconduct by failing to return some papers to Defendant that were in his backpack at the time of his arrest and by allowing police officers to release a small safe from T.B.'s car to her daughter, L.B., instead of giving it to Defendant.  Defendant argues that because the safe had contained a firearm at one point, he could have used it as evidence that T.B. had a firearm in her possession.

¶20     Prosecutorial misconduct will warrant a mistrial if the misconduct "permeates the entire trial and deprives the defendant of a fair trial."  *State v. Trani*, 200 Ariz. 383, 384, ¶ 6, 26 P.3d 1154, 1155 (App. 2001).  We perceive no such misconduct here.

¶21     Defendant's Supplemental Brief states that the various documents in his backpack included: (1) D.B.'s school enrollment forms; (2) paternity test results regarding D.B.; (3) D.B.'s birth certificate; and (4) Defendant's mental health paperwork from Jewish Family Health Services.  Because no issues even remotely related to these documents were contested at trial, the documents were irrelevant and their absence in no way deprived Defendant of a fair trial.

¶22     The fact that the police returned property of the victim to the victim's daughter instead of Defendant did not prejudice him.  In fact, evidence *was* introduced at trial that T.B. had owned a gun, and the absence of evidence of the safe was therefore not prejudicial.  We conclude that Defendant has not demonstrated any misconduct on the part of the state.

      D.      Defendant Was Not Denied His Right to a Speedy Trial.

**¶23**      Defendant argues that he was denied his right to a speedy trial under the Sixth Amendment and Ariz. R. Crim. P. 8.2(a)(3). Rule 8.2(a)(3) provides that for a complex case, a defendant shall be tried within 270 days of arraignment. Defendant's arraignment was held on June 13, 2012, and his trial began on August 13, 2013, well outside the 270-day limit.

**¶24**      Rule 8.5(b) allows the trial court to grant a motion to continue trial upon a showing that extraordinary circumstances exist and that the delay is indispensable to the interests of justice. Delays resulting from continuances in accordance with Rule 8.5 are excluded from computation of the time limits set forth in Rule 8.2. *See* Ariz. R. Crim. P. 8.4(e).

**¶25**      The state was granted two continuances pursuant to Rule 8.5. The state filed a motion for each continuance stating the reasons justifying the continuance. These reasons included the school schedules of T.B.'s children who lived out of state and needed to travel back to Arizona to testify at trial, and various other scheduling conflicts. Although defense counsel was unopposed to a continuance, Defendant refused to waive time. Both times, in accordance with Rule 8.5, the trial court found that the delay was indispensable to the interests of justice and that extraordinary circumstances existed warranting a continuance. Additional pre-trial hearings and scheduling conflicts made it impossible to conduct a trial before August 2013.

**¶26**      The decision to grant a motion for continuance falls within the sound discretion of the trial judge, and we will not reverse absent a clear abuse of discretion that is demonstrably prejudicial to the defendant. *See State v. Jackson*, 112 Ariz. 149, 154, 539 P.2d 906, 911 (1975). "Prejudice sufficient to support a claim of denial of the Sixth Amendment right to a speedy trial requires a specific showing of how the passage of time has impaired the defendant's ability to prepare his defense." *United States v. Paul*, 326 F. Supp. 2d 382, 387 (E.D.N.Y. 2004); *see also United States v. Jackson*, 504 F.2d 337, 341 (8th Cir. 1974) ("The governing standard in determining the prejudicial effect of a pre-indictment delay is whether the delay has impaired the defendant's ability to defend himself.") (quotation omitted). Here, Defendant has not demonstrated prejudice from the continuances, and we see nothing in the record to indicate that the court abused its discretion under the rules.

      E.      Photos of the Deceased Victim Were Admissible.

**¶27**      Defendant next argues that the trial court abused its discretion by admitting gruesome photos of T.B. into evidence. The state introduced photos of T.B. during the testimony of the medical examiner and the testimony of a detective

who observed T.B. at the hospital emergency room. They both took photographs of T.B.'s injuries and of identifying information on her body including the bullet holes/gunshot wounds, exit wounds, and T.B.'s tattoos.

¶28 "Trial courts have broad discretion to admit photographs in criminal trials. . . . If a photograph is relevant, the court must determine if it is inflammatory and, if so, whether the danger of unfair prejudice substantially outweighs the photograph's probative value." *State v. Roscoe*, 184 Ariz. 484, 494, 910 P.2d 635, 645 (1996) (citations omitted). Photos of wounds and autopsy photographs are usually admissible to show how the victim was killed, the nature of the injuries, and the features of wounds because they are probative in nature and their probative value generally outweighs the danger of unfair prejudice. *See, e.g.*, *State v. Thornton*, 187 Ariz. 325, 332, 929 P.2d 676, 683 (1996); *State v. Bolton*, 182 Ariz. 290, 305, 896 P.2d 830, 845 (1995); *State v. Walton*, 133 Ariz. 282, 292, 650 P.2d 1264, 1274 (App. 1982). Here, the photographs were not unduly gruesome or inflammatory; they were relevant and probative and depicted the nature of T.B.'s injuries and death. We find no error in their admittance.

F.      The Trial Court Properly Sentenced Defendant.

¶29 Finally, Defendant argues that the trial court erred by sentencing him using alleged aggravators not found by a jury in violation of the standard set forth in *Blakely v. Washington*, 542 U.S. 296 (2004).

In *Blakely*, the Supreme Court held that the imposition of an aggravated sentence without a finding of any aggravating factor by a jury violates the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

*State v. Martinez*, 209 Ariz. 280, 283, ¶ 10, 100 P.3d 30, 33 (App. 2004), *aff'd in part*, 210 Ariz. 578, 115 P.3d 618 (2005) (citation omitted).

¶30 Because Defendant murdered T.B. in May 2012, the current version of A.R.S. § 13-751 was not applicable at his sentencing hearing. Instead, the applicable version of the statute provided that a defendant convicted of first-degree murder shall be sentenced to either life or natural life. A defendant who is sentenced to natural life is not eligible for release from confinement on any basis. However, if the defendant is sentenced to life, the defendant may not be released before the completion of the service of 25 years. *See* A.R.S. § 13-703 (2009).

¶31 In this case, the court considered many factors in its sentencing decision, including Defendant's family history, the harm done to the children, his

violent tendencies, and his level of remorsefulness. Ultimately the court decided to sentence Defendant to natural life.

¶32 "The trial court's consideration of aggravating factors in imposing the natural life sentence does not violate the holding in *Blakely.*" *Martinez*, 209 Ariz. at 283, ¶ 12, 100 P.3d at 33. "In *Blakely*, the Court specifically distinguished the situation where judicial sentencing factors merely impact the minimum punishment available from that where they increase the maximum punishment above that authorized by the verdict." *Id.* at 283, ¶ 13, 100 P.3d at 33. "Because a guilty verdict for first-degree murder authorizes the court to impose a life sentence either with or without the possibility of release, the court may properly consider the statutory sentencing factors, without the need for jury findings regarding those factors, in deciding whether to allow the possibility of release." *Id.* at 284, ¶ 13, 100 P.3d at 34. There was no error in the court's imposition of the natural life sentence, much less fundamental error.

II.   OUR INDEPENDENT REVIEW OF THE RECORD REVEALS NO FUNDAMENTAL ERROR.

¶33 Our review of the record reveals no fundamental error. Defendant was present and represented at all critical stages. The record shows no evidence of jury misconduct and the jury was properly comprised of 12 jurors. *See* A.R.S. § 21-102(A); Ariz. R. Crim. P. 18.1(a).

¶34 The evidence that the state presented at trial was properly admissible and was sufficient to support Defendant's convictions. Defendant was charged with the first-degree murder of T.B. under A.R.S. §§ 13-1101, 13-1105 and 13-751(A), which required the state to prove that Defendant intentionally or knowingly caused the death of another person with premeditation. Premeditation means that the defendant acted with either the intention or the knowledge that he would kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection. *See* A.R.S. § 13-1101(1). "Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." *Id.* The state produced evidence that Defendant knowingly and intentionally shot and killed T.B. with premeditation. He brought a gun to the promotion ceremony that he knew T.B. was attending, waited for her to walk towards her car, then ran up to the windshield and pointed the gun at her, moved to the driver's side window while still pointing the gun at her, and shot her three times. This evidence was sufficient to allow the jury to find Defendant guilty of first-degree murder.

¶35 At sentencing, Defendant was given an opportunity to speak, and the court stated on the record the evidence and materials it considered in imposing

a sentence. The court imposed legal sentences for the offenses, *see* A.R.S. §§ 13-701, 13-703, and correctly calculated Defendant's presentence incarceration credit under A.R.S. § 13-712(B).

**CONCLUSION**

**¶36** We have reviewed the record for fundamental error and find none. *See Leon*, 104 Ariz. at 300, 451 P.2d at 881. Accordingly, we affirm Defendant's convictions and sentences.

**¶37** Defense counsel's obligations pertaining to this appeal have come to an end. *See State v. Shattuck*, 140 Ariz. 582, 584-85, 684 P.2d 154, 156-57 (1984). Unless, upon review, counsel discovers an issue appropriate for petition for review to the Arizona Supreme Court, counsel must only inform Defendant of the status of this appeal and his future options. *See id.* Defendant has 30 days from the date of this decision to file a petition for review *in propria persona*. *See* Ariz. R. Crim. P. 31.19(a). Upon the court's own motion, Defendant has 30 days from the date of this decision in which to file a motion for reconsideration.



Ruth A. Willingham · Clerk of the Court
FILED: jt