No. 75,808

STATE OF KANSAS, *Appellee*, v. JERRY LEE ROBINSON, *Appellant*.

934 P.2d 38

Opinion filed March 7, 1997.

*B. Kay Huff*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Bryan M. Hastert*, deputy county attorney, argued the cause, and *Brett W. Berry*, assistant county attorney, and *Alex R. Stavrou*, legal intern, were on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Jerry Lee Robinson, from a jury conviction for depraved heart second-degree murder in violation of K.S.A. 21-3402(b). Robinson was 14 years of age when he killed Clyde Richard Crowley by striking him in the head with a golf club.

Robinson contends the depraved heart second-degree murder statute is unconstitutionally vague; that the evidence is insufficient to prove depraved heart murder; that he was entitled to a voluntary manslaughter instruction; that his confession was inadmissible, and that the prosecution improperly argued in closing argument that Robinson was a member of a gang.

The victim, Richard Crowley, was clearly the initial aggressor in this case. On the day of his death, Crowley went to the Ottawa Police Department because he felt the police were not responding to two separate incidents in which his sons had been threatened by Jeremy Hendrickson and his friends. Crowley was upset and told the police that if they did not take care of the problem, then he would.

From the police department, Crowley drove to Forest Park, where he inquired as to whether Jeremy Hendrickson was at the park. Upon receiving a negative response, Crowley went home. Crowley later returned to Forest Park where he spotted Jeremy Hendrickson, Eddie Carter, Tony Surber, and Robinson. Crowley did not know the four boys, but Hendrickson identified himself. Crowley approached Hendrickson, yelling at him to leave his sons alone. Crowley spit in Hendrickson's face. Then Surber made a comment and Crowley yelled at Surber, "I am [Richard Crowley] and you don't know who you're fucking with." Crowley hit Surber twice in the face. At this point, Surber took a knife from Robinson, which Robinson had been using to clean his nails. Surber held up the knife and Crowley stated, "Oh, you want to play games." Crowley returned to his truck and obtained a metal baseball bat. Crowley began to chase the boys with the bat, swinging at them when he got close. While running away from Crowley, the boys spotted golf clubs hanging out of a window of a car in the park and each boy grabbed a club. The boys began chasing Crowley and eventually surrounded him. The boys taunted Crowley by calling him names and swinging their clubs at him, although they did not actually hit him. At this point, Crowley had not hit anyone with the bat and was not swinging it. He was using the bat defensively, trying to avoid being struck with the golf clubs. The boys testified that they

engaged in this "fencing" in order to hold Crowley at bay until the police arrived.

Patricia Taylor and her husband, William Taylor, were driving through the park at the time of the altercation. Patricia saw Crowley with a baseball bat trying to hit a group of boys. She saw the boys run and grab golf clubs from a parked car. The boys then "jousted" or "fenced" with Crowley. Crowley asked the Taylors to "give me a hand," but the Taylors said they would get the police. The Taylors left the park to call the police. William Taylor testified the boys did not look like they were intending to harm Crowley when Taylor saw them.

Later, while the boys and Crowley were still "fencing," Victoria Bond drove her car through Forest Park. Scott Renyer, a passenger in the car, saw the altercation and heard someone from the boys' group yell, "I'll teach you to hit my brother again, mother fucker!" Crowley then broke free from the boys, running towards Bond's moving vehicle. According to Renyer, Crowley "hollered" for help. Bond and Renyer had five children in the back seat of the car. They were worried about the children so they did not stop to help Crowley. One eyewitness, Nick Griffin, then 16 years old, testified that when Crowley ran towards Bond's car, the boys chased him, grabbed him, and prevented him from getting into Bond's moving vehicle.

After Crowley hollered at Renyer, Renyer testified that he saw one of the boys, Surber, hit Crowley in the back with a golf club. Crowley then chased Surber, with the other three boys chasing Crowley. Surber tripped, fell to the ground, and Crowley hit Surber twice with the bat. Griffin, a witness for the State, testified that Hendrickson ran up to Crowley and struck Crowley twice in the back or in the ribs with a golf club. After Hendrickson hit him, Crowley turned away from Surber to see who was hitting him. With this opportunity, Surber rolled away from Crowley and began to get off the ground. At this time, Robinson fatally struck Crowley in the head with his golf club. Robinson testified that he was not trying to hit Crowley in the head, but was trying to hit Crowley in the arms in order to make him stop hitting Surber with the bat. Robinson testified that he could not remember if his eyes were

open or shut when he hit Crowley. After Robinson struck Crowley in the head, he let go of the club because it was stuck in Crowley's head. Crowley fell to the ground, and Robinson ran home.

The police arrived and removed the baseball bat from Crowley's hands before transporting him to the hospital, with the golf club still impaled in his head. Crowley died shortly thereafter in the emergency room of Ransom Hospital due to the blow to his head. The autopsy revealed that the club directly struck Crowley's head and was not deflected by his arm. The autopsy also showed numerous defensive wounds on Crowley's hands, but did not show any bruising on his back or ribs.

A few hours after the altercation, Robinson, along with his mother and his mother's boyfriend, returned to the park where the police were investigating the scene. Robinson asked to talk to a police officer, and he told the officer his version of what occurred.

Upon completing its investigation of the altercation, the State charged Robinson with depraved heart second-degree murder in violation of K.S.A. 21-3402(b). The jury was instructed on depraved heart second-degree murder and on the lesser included offense of involuntary manslaughter. The jury convicted Robinson of depraved heart second-degree murder. The presumptive guidelines sentence for this crime is 68 to 77 months in prison. Robinson filed a motion for a downward departure in sentencing. The trial court granted this motion, based on Robinson's young age and the fact Crowley was the initial aggressor. The trial court sentenced Robinson to a term of 55 months. Robinson timely filed a notice of appeal from his conviction to the Court of Appeals. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

## VAGUENESS ISSUE

The trial court instructed the jury on the crime with which Robinson was charged, depraved heart second-degree murder, a severity level 2 crime. K.S.A. 21-3402(b). The instruction provided in pertinent part:

"To establish this charge, each of the following claims must be proved:

"1. That the defendant killed Clyde R. Crowley unintentionally but recklessly under circumstances showing extreme indifference to the value of human life. . . ."

The trial court also instructed the jury on the lesser included offense of involuntary manslaughter, a severity level 5 crime. K.S.A. 21-3404(a) and (c). The instruction provided in pertinent part:

"1. That the defendant unintentionally killed Clyde R. Crowley;
"2. That it was done recklessly or during the commission of a lawful act in an unlawful manner. . . ."

Since both of these instructions use the term "recklessly," the court instructed the jury on the definition of "reckless conduct." This definition provided:

"Reckless conduct means conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger."

Robinson argues that depraved heart second-degree murder, the unintentional but reckless killing under circumstances manifesting extreme indifference to the value of human life (K.S.A. 21-3402[b]), is indistinguishable from reckless involuntary manslaughter, which is the unintentional killing of a human being committed recklessly (K.S.A. 21-3404[a]). Robinson contends that the definition of recklessness adds to the fact that the two crimes are indistinguishable. According to Robinson, the definition of recklessness—recognizing that one's conduct creates a danger to another and disregarding this danger—constitutes a manifestation of "extreme indifference to the value of human life." Further, according to Robinson, the depraved heart murder statute and the reckless involuntary manslaughter statute, with the accompanying jury instructions, do not tell a jury how to distinguish between the two crimes. As such, Robinson contends that both depraved heart second-degree murder and reckless involuntary manslaughter punish the same conduct—the killing of a human being, while recognizing the imminent danger created, but consciously disregarding the danger without justification, which is a manifestation of an extreme indifference to the value of human life.

Thus, Robinson claims that depraved heart second-degree murder, the more serious crime, is void for vagueness, thereby violating due process, because it does not adequately distinguish itself from reckless involuntary manslaughter. Due to this constitutional de-

fect, Robinson argues that prosecutors and jurors may decide to punish one defendant for depraved heart second-degree murder, a severity level 2 crime, but punish a different defendant for reckless involuntary manslaughter, a severity level 5 crime, for the same conduct, based on discriminatory, arbitrary and subjective reasons. This results in an unconstitutional and impermissible violation of due process and equal protection.

According to Robinson, the only way for a jury to distinguish between depraved heart second-degree murder and reckless involuntary manslaughter is for a judge to instruct the jury on the definition of the phrase used in the depraved heart murder statute—"manifesting extreme indifference to the value of human life." If this were done, Robinson argues, the jury could then determine how "extreme indifference" differs from the term "recklessness." Once the jury understood the difference between these two terms, it would have a uniform standard from which to determine if a defendant was guilty of mere reckless conduct under the reckless involuntary manslaughter statute or was guilty of reckless conduct with an additional showing of "extreme indifference to the value of human life" under the depraved heart second-degree murder statute.

According to the court and the prosecution, a definition of this phrase was not necessary because it is easily understood by a layperson. However, Robinson contends that many people would consider any degree of homicide to manifest an "extreme indifference to the value of human life." If so, then the jurors may have felt that they could easily understand the phrase, but they would not have been able to distinguish between depraved heart second-degree murder and reckless involuntary manslaughter because both crimes involve reckless killings and both crimes, in the jurors' minds, satisfy the "extreme indifference to the value of human life" element without requiring any extra or extreme recklessness.

In support of his argument, Robinson cites *People v. Marcy*, 628 P.2d 69 (Colo. 1981). In this case, the defendant was convicted in Colorado of first-degree murder by extreme indifference. The defendant appealed, alleging that the statute he was convicted under

was unconstitutional because, *inter alia*, the crime was not rationally distinguishable from murder in the second degree.

Robinson cites *Marcy* as support for his contention that indistinguishable statutes violate equal protection. *Marcy* does support this argument. However, the holding of *Marcy* is in exact opposition to Robinson's position that depraved heart second-degree murder and reckless involuntary manslaughter are indistinguishable.

In further support of his argument that depraved heart second-degree murder is indistinguishable from reckless involuntary manslaughter and therefore void for vagueness, Robinson asserts that most of the jurisdictions which have a depraved heart murder statute provide the jury with a definition of the term "extreme indifference." This definition clarifies that "extreme indifference to the value of human life" means disregard of a grave risk of death or a substantial certainty of death. According to Robinson, if this type of definition was provided in Kansas, then a jury would be able to distinguish between depraved heart second-degree murder (requiring extreme recklessness) and reckless involuntary manslaughter (requiring regular recklessness). Then Robinson argues the second-degree murder statute would not be void for vagueness, creating an unconstitutional violation of due process and equal protection. Robinson asks this court to hold that the second-degree murder statute, as used in this case, without a definition of the term "extreme indifference to the value of human life," is unconstitutional, thereby requiring a reversal of his conviction.

Prior to 1992, Kansas did not recognize the crime of depraved heart murder. In 1992, the Kansas Criminal Code was substantially revised. The Kansas Judicial Council Criminal Law Committee wrote the initial versions of these amendments, including a new depraved heart homicide statute. See Tonkovich, *The Kansas Criminal Code: 1992 Amendments*, 41 Kan. L. Rev., Crim. Proc. Ed. 73 (1993). When considering the passage of the amendments, the Senate Judiciary Committee looked to the Judicial Council's comments regarding the proposed depraved heart crime.

"Depraved-heart murder is fundamentally similar to felony murder and involuntary manslaughter. In felony murder cases, the commission of the underlying

felony provides the extreme recklessness required for criminal liability. In involuntary manslaughter cases, the commission of the underlying unlawful act or the reckless conduct provides the necessary recklessness. Depraved-heart murder, in terms of degree, falls between felony murder (first degree murder) and involuntary manslaughter. . . . Adding depraved-heart murder provides a middle category to cover *extremely reckless* conduct . . . ." 41 Kan. L. Rev., Crim. Proc. Ed. at 78.

The depraved heart second-degree murder statute, the reckless involuntary manslaughter statute, and the definition of recklessness in Kansas are all patterned after the Model Penal Code. See Model Penal Code § 210.2(1)(b) (1980), § 210.3(1)(a) (1980), and § 2.02(c) (1962), respectively. Besides Kansas, there are several states which have a depraved heart homicide statute whose language is either identical, or substantially similar, to the language contained in the Model Penal Code. Two of these states, Arizona and New Hampshire, have specifically addressed the void-for-vagueness issue.

In the Arizona case, *State v. Walton*, 133 Ariz. 282, 650 P.2d 1264 (Ct. App. 1982), the defendant was convicted of reckless second-degree murder and he appealed. One of the issues the defendant raised in his appeal was that the statute he was convicted under, reckless second-degree murder, violated equal protection because it was indistinguishable from the reckless manslaughter statute and violated due process because it was too vague.

In comparing the mental state required for each crime, the Arizona court concluded that "two distinct measures of care differentiate[d] the condition of recklessness expressed in the two statues, and an extreme indifference creating a grave risk of death to another [as required by the reckless second-degree murder statute] is a more culpable mental state than the requirement of a conscious disregard of a substantial and unjustifiable risk [as required by the reckless manslaughter statute]." 133 Ariz. at 291. Thus, the court found that the two statutes were distinguishable and that the reckless second-degree murder statute was not void for vagueness.

In the New Hampshire case, *State v. Dow*, 126 N.H. 205, 489 A.2d 650 (1985), the defendant was convicted of second-degree murder. He appealed, claiming that the second-degree murder statute was vague, due to the "extreme indifference" phrase in the

statute, and claiming that the statute was indistinguishable from the New Hampshire manslaughter statute. Citing to several other states which have found similar statutes not to be unconstitutionally vague, the court upheld the murder statute as constitutional. 126 N.H. at 208. In so holding, the court stated:

"Both the second degree murder statute, RSA 630:1-b, I(b), and the manslaughter statute, RSA 630:2, I(b) (Supp. 1983), require proof that a defendant caused the death of another 'recklessly' as that term is defined in RSA 626:2, II(c). The second degree murder statute, however, requires proof of the additional element that the death be caused 'under circumstances manifesting an extreme indifference to the value of human life.' RSA 630:1-b I(b). As we previously have stated:

' "Circumstances manifesting an extreme indifference to the value of human life" means something more than merely being aware of and consciously disregarding a substantial and unjustifiable risk [the definition of recklessness]. "If the advertence [to the risks involved] and the disregard are so blatant as to manifest extreme indifference to life, then the offense is murder. . . ." Thus where the accused's behavior "constitutes a gross deviation" from law-abiding conduct, RSA 626:2, II(c), but does not manifest "an extreme indifference to the value of human life," RSA 630:1-b I(b), the jury may properly find only manslaughter. Where, however, the evidence supports the additional element of "extreme indifference," the jury may find murder in the second degree. The existence and extent of disregard manifested is a factual determination to be made by the jury.' " 126 N.H. at 207.

"Interpretation of a statute is a question of law. An appellate court's review of a question of law is unlimited." *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, Syl. ¶ 1, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995). See *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). "When determining a question of law, this court is not bound by the decision of the district court." *Memorial Hospital Ass'n, Inc. v. Knutson*, 239 Kan. 663, 668, 722 P.2d 1093 (1986). "[A] statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down." *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). Accord *State v. Scherzer*, 254 Kan. 926, Syl. ¶ 6, 869 P.2d 729 (1994). "This court not only has the authority, but also the duty, to construe a statute in such a manner

that is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989).

" 'It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained.' " *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993). See *State v. Gonzales*, 255 Kan. 243, 248-49, 874 P.2d 612 (1994).

" 'It is presumed the legislature understood the meaning of the words it used and intended to use them; that the legislature used the words in their ordinary and common meaning; and that the legislature intended a different meaning when it used different language in the same connection in different parts of a statute.' [Citation omitted.]" *Bank of Kansas v. Davison*, 253 Kan. 780, 788, 861 P.2d 806 (1993).

" '[T]he void-for-vagueness analysis is based upon a due process requirement that a criminal statute is unconstitutionally vague and indefinite unless its language conveys a sufficiently definite warning of the conduct proscribed when measured by common understanding and practice. *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 (1983).' *City of Wichita [v. Wallace]*, 246 Kan. [253, 258, 788 P.2d 270 (1990)]. . . .

"In addition to the inquiry whether the proscribed conduct is adequately defined, the court recognizes that a second inquiry is appropriate. That inquiry is ' "whether the ordinance adequately guards against arbitrary and discriminatory enforcement." *Dunn*, 233 Kan. at 418 (citing *Cardarella v. City of Overland Park*, 228 Kan. 698, 702, 620 P.2d 1122 [1980]).' *City of Wichita*, 246 Kan. at 259. When making either inquiry, the court should bear in mind that '[t]he standards of certainty in a statute punishing criminal offenses are higher than in those depending primarily upon civil sanctions for enforcement.' 246 Kan. 253, Syl. ¶ 3." *State v. Adams*, 254 Kan. 436, 438-39, 866 P.2d 1017 (1994).

Based on the plain language of the depraved heart second-degree murder statute and the legislative history behind it, the legislature intended for the depraved heart murder statute to carry a higher degree of culpability than the reckless involuntary manslaughter statute, thereby making the two statutes distinguishable. This intent is further supported by the commentary to the Model Penal Code, which provides:

"Ordinary recklessness . . . is made sufficient for a conviction of manslaughter under Section 210.3(1)(a). In a prosecution for murder, however, the Code calls for the further judgment whether the actor's conscious disregard of the risk, under the circumstances, manifests extreme indifference to the value of human life. . . .

Whether recklessness is so extreme that it demonstrates similar indifference is not a question, it is submitted, that can be further clarified. It must be left directly to the trier of fact under instructions which make it clear that recklessness that can fairly be assimilated to purpose or knowledge should be treated as murder and that less extreme recklessness should be punished as manslaughter." A.L.I., Model Penal Code & Commentaries, Part II § 210.2, Comment 4, pp. 21-22 (1980).

"Conviction of the more serious crime requires proof that the defendant acted 'recklessly under circumstances manifesting extreme indifference to the value of human life.' This language describes a kind of culpability that differs in degree but not in kind from the ordinary recklessness required for manslaughter." A.L.I., Model Penal Code & Commentaries, Part II § 210.3, Comment 4, p. 53.

Does the language of Kansas statutes convey the legislature's intent that statutes are meant to punish different behavior? Does the "extreme indifference" phrase indicate that depraved heart murder requires a higher degree of recklessness? Is the "extreme indifference" phrase understandable standing alone or is a definitional instruction necessary?

Both depraved heart murder and reckless involuntary manslaughter require recklessness—that the killing be done under circumstances showing a realization of the imminence of danger and a conscious disregard of that danger. Depraved heart murder requires the additional element that the reckless killing occur under circumstances manifesting extreme indifference to the value of human life.

The question is whether the jury, from looking at the instructions, would know that the two statutes, depraved heart murder and reckless involuntary manslaughter, do not punish the same thing. The phrase in the depraved heart murder statute requiring the "extreme indifference to the value of human life" indicates, as the legislature intended, that this statute requires a higher degree of recklessness than that required by the reckless involuntary manslaughter statute. If a jury is given a lesser included instruction on reckless involuntary manslaughter, then the jury must assume that some killings fall under this crime. Thus, the jury is put on notice that it must determine whether a reckless killing involves an extreme degree of recklessness and is depraved heart murder or involves a lower degree of recklessness and is involuntary manslaugh-

ter. The jury does this by determining whether a particular reckless killing indicates an extreme indifference to the value of human life which is beyond that indifference present in all reckless killings. See *State v. Cook*, 259 Kan. 370, 403, 913 P.2d 97 (1996) (even though all murders are heinous, atrocious, and cruel, the legislature reserved the hard 40 sentence under K.S.A. 1992 Supp. 21-4628 for murders that are "particularly heinous, atrocious, or cruel" to a "special or unusual degree, to an extent greater than in other cases"). Thus, the two statutes (depraved heart murder and involuntary manslaughter) are distinguishable and do not unconstitutionally violate due process or equal protection.

Finally, when the jury is determining whether a reckless killing indicates an extreme indifference to the value of human life beyond that indifference present in all reckless killings, the question is whether the jury can determine what "extreme indifference to the value of human life" is or whether this phrase is so vague that a jury needs an instruction to explain it. The comments to the Model Penal Code depraved heart statute, which the Kansas depraved heart statute is patterned after, state:

"Given the Model Code definition of recklessness, the point involved is put adequately and succinctly by asking whether the recklessness rises to the level of 'extreme indifference to the value of human life.' As has been observed, it seems undesirable to suggest a more specific formulation. [Other] variations . . . retain in some instances greater fidelity to the common-law phrasing but they do so at great cost in clarity. Equally obscure are the several attempts to depart from the common law . . . . The result of these formulations is that the method of defining reckless murder is impaired in its primary purpose of communicating to jurors in ordinary language the task expected of them. The virtue of the Model Penal Code language is that it is a simpler and more direct method by which this function can be performed." A.L.I., Model Penal Code & Commentaries, Part II § 210.2, Comment 4, pp. 25-26 (1980).

A jury is expected to decipher many difficult phrases without receiving specific definitions, such as the term "reasonable doubt." The phrase "extreme indifference to the value of human life" is not so vague as to be unconstitutionally void.

We hold that depraved heart second-degree murder requires a conscious disregard of the risk, sufficient under the circumstances, to manifest extreme indifference to the value of human life. Reck-

lessness that can be assimilated to purpose or knowledge is treated as depraved heart second-degree murder, and less extreme recklessness is punished as manslaughter. Conviction of depraved heart second-degree murder requires proof that the defendant acted recklessly under circumstances manifesting extreme indifference to the value of human life. This language describes a kind of culpability that differs in degree but not in kind from the ordinary recklessness required for manslaughter.

After oral argument in this case, the Court of Appeals decided this issue and reached the same result in *State v. Mitchell*, 23 Kan. App. 2d 413, 932 P.2d 1012 (1997).

## SUFFICIENCY OF EVIDENCE

Robinson contends that the phrase "manifesting extreme indifference to the value of human life" in the depraved heart second-degree murder statute refers to a grave indifference to the value of human life *in general*, not to a particular or specific human life. Under this interpretation of the statute, Robinson contends that the evidence was insufficient to convict him of depraved heart murder because, if he manifested an extreme indifference to the value of human life at all, the evidence showed his indifference was only directed at one specific person, Crowley, and was not directed at human life in general.

In interpreting the statute as requiring a grave indifference to the value of human life in general, Robinson contends that depraved heart murder is punished so severely, even though it is an unintentional killing, because one who is guilty of this crime has put a great many lives in danger, not just one. In support of his interpretation of the depraved heart statute, Robinson cites to *People v. Jefferson*, 748 P.2d 1223 (Colo. 1988). In *Jefferson*, the court found that the revised Colorado extreme indifference murder statute was intended to apply to situations "in which the actor demonstrates an indifference to human life generally, as distinguished from indifference to, or willingness to take, a particular human life." 748 P.2d at 1232.

This case does not support Robinson's position for two reasons. First, the Colorado statute is different from the Kansas depraved

heart murder statute. The Colorado statute specifically states that a defendant convicted under the statute must evidence an "attitude of *universal* malice manifesting extreme indifference to the value of human life *generally*." (Emphasis added.) The Kansas Legislature did not include such language in the Kansas depraved heart murder statute. Thus, the Colorado case, based on the language in the Colorado statute, is not persuasive.

Second, the Colorado court did not interpret the "general indifference" language in the Colorado statute to mean that indifference directed only at one human life failed to satisfy the statute. Instead, the court interpreted this language as indicating that a defendant convicted under the statute must have had indifference toward human life, one or many, without knowing or caring who the victim(s) was(were). In other words, the court interpreted "general indifference" as nonspecific indifference, not an indifference directed at numerous persons. As long as the defendant has not selected the victim for a specific reason, but has just selected the victim generally, then the defendant manifests the appropriate indifference under the Colorado extreme indifference statute, even if the indifference is only directed at one person. This interpretation of the Colorado statute is supported by the language of the statute which provides that a defendant is guilty of extreme indifference murder "under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, and he knowingly engages in conduct which creates a grave risk of death to *a person*, or persons, other than himself, and thereby causes the death of another." (Emphasis added.) 748 P.2d at 1226. The italicized language indicates that a defendant may still be convicted of extreme indifference murder in Colorado even if the defendant only directs indifference at a single person and not at the world in general. Thus, the *Jefferson* case does not support Robinson's position.

Nonetheless, Robinson argues that the extreme indifference required by the depraved heart murder statute in Kansas must be directed toward human life in general and not just at one particular person. Robinson contends that the evidence at trial indicated that his conduct was directed only toward one person, Crowley, and not

toward human life in general. The evidence indicated that Robinson only swung the golf club at one person, not a group of people, and only had the chance to hit and did hit only one person. Robinson contends that since his conduct did not show an extreme indifference to human life in general, the evidence was insufficient to convict him of depraved heart murder.

The Judicial Council's Comments regarding the proposed depraved heart murder statute provide:

"Depraved heart murder includes extremely reckless killings and killings resulting from actions which were intended to inflict serious bodily injury. Examples of depraved heart murder include: (1) killing a child while target shooting at school windows during school hours; and (2) killing a person while beating him with a baseball bat with intent to severely injure him." 41 Kan. L. Rev., Crim. Proc. Ed. at 78.

The Kansas depraved heart statute is patterned after the Model Penal Code's depraved heart statute. The commentary to the Model Penal Code indicates that extreme indifference as to the value of one specific human life is enough to satisfy the elements of depraved heart murder. For instance, the comments refer to the classic example of depraved heart murder when a defendant unintentionally kills a friend through the game of Russian roulette. In such a case, the defendant demonstrated extreme indifference to the value of only one specific human life, the friend with which he was playing Russian roulette, but the defendant's conduct still qualified as depraved heart murder under the Model Penal Code.

Thus, the comments to the Model Penal Code's depraved heart murder statute do not indicate that general indifference is a requirement of depraved heart murder. Although general indifference is often present in crimes prosecuted as depraved heart murders, it is not required under the Model Penal Code. The Kansas Legislature did not indicate that it intended to part with the Model Penal Code and require general indifference to the value of human life as a requirement of depraved heart second-degree murder. Thus, it appears that the Kansas Legislature intended for the elements of depraved heart murder to be met if the defendant manifested an extreme indifference to the value of one specific human life.

The evidence was sufficient in this case for the jury to find that Robinson recklessly killed a person while manifesting an extreme indifference to the value of one specific human life—Crowley's life. The evidence indicated that Robinson swung a golf club at Crowley with great force, intending to hit Crowley.

Next, Robinson points out that Kansas has long recognized the defense of self-defense if a person is attacked by an aggressor. See *State v. Griblin*, 12 Kan. App. 2d 677, 678, 753 P.2d 843 (1988). Robinson also focuses on the fact that if a person lawfully engages in self-defense or defense of another, but to an excessive degree, then the person is only guilty of involuntary manslaughter. K.S.A. 21-3404(c). Based on these facts, Robinson asserts that depraved heart murder cannot and should not apply to imperfect self-defense situations. Since, according to Robinson, he killed Crowley in an imperfect self-defense situation, he argues that depraved heart murder cannot apply to this killing. Based on the facts of the killing, Robinson contends that the evidence was insufficient to convict him of depraved heart murder.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994). Viewing the evidence in the light most favorable to the prosecution, Robinson struck Crowley in the head with the golf club, even though his friend, whom Crowley had struck with a bat, was getting up off of the ground and was no longer in danger. While Robinson testified that he did not aim at any particular part of Crowley's body, the State called a medical expert to the stand who testified that the golf club hit Crowley's head with direct force and was not deflected off any other part of Crowley's body. The jury could have inferred from this testimony that Robinson intentionally aimed for Crowley's head. Even if the jury did not find such intent, the jury could have found that blindly swinging a golf club at a person with great force constitutes extreme recklessness "manifesting an extreme indifference to the value of human life." Based on these

facts, viewed in the light most favorable to the prosecution, a rational factfinder could have found Robinson guilty of depraved heart second-degree murder beyond a reasonable doubt.

Robinson also argues that depraved heart murder cannot and should not apply to imperfect self-defense, which, according to Robinson, is what occurred here. In this case, the jury was instructed on the lesser included offense of involuntary manslaughter which punishes a person for committing a lawful act (self-defense or the defense of another) in an unlawful manner (by using excessive force). In fact, the jury was specifically instructed that the "use of excessive force may be found to be an unlawful manner of committing the lawful act of self-defense/defense of another." The jury was also instructed on the fact that the proper defense of another justifies a killing. However, the jury found that these instructions did not apply to the facts of the case. Instead, the jury found that all of the elements of depraved heart second-degree murder were met, and the jury convicted Robinson of this crime. As previously discussed, the evidence was sufficient for such conviction when viewed in a light most favorable to the prosecution. It is the jury's role to weigh the evidence and evaluate the credibility of the witnesses. Based on the facts discussed above, a rational factfinder could have found Robinson guilty of depraved heart second-degree murder beyond a reasonable doubt, despite the instructions on involuntary manslaughter, imperfect self-defense, and self-defense. Thus, the evidence was sufficient to support this conviction and this issue fails.

## LESSER INCLUDED OFFENSE

Robinson asserts that the court erred in not instructing the jury on voluntary manslaughter, K.S.A. 21-3403(b). This statute defines voluntary manslaughter as the *"[i]ntentional* killing of a human being committed . . . upon an unreasonable but honest belief that circumstance existed that justified deadly force." (Emphasis added.)

During the trial, Robinson's counsel repeatedly argued that Robinson acted in self-defense. Nevertheless, the jury did not find that Robinson's actions were justified in any way. However, Robinson

alleges that the jury reached this conclusion because the jury was not allowed to consider the lesser included crime of voluntary manslaughter. Based on the testimony that Crowley was the aggressor and that Robinson acted in defense of his friend, Robinson alleges that a properly instructed jury might have found that he unreasonably used deadly force under an honest but mistaken belief that deadly force was justified and convicted him of voluntary manslaughter instead of depraved heart murder.

"[A]n instruction on an included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense." *State v. Gregory*, 218 Kan. 180, 183, 542 P.2d 1051 (1975). Robinson testified at trial that he did not intend to kill Crowley. The State did not contest this testimony. Based on the uncontroverted evidence, there was no way in which the jury could have found Robinson guilty of voluntary manslaughter, a crime which requires an intentional killing. Thus, the trial court was not required to instruct the jury on this lesser included offense of voluntary manslaughter.

The jury was instructed on involuntary manslaughter, which punishes a lawful act (defense of another) performed in an unlawful manner (by using excessive force). In fact, the jury was specifically instructed that "[t]he use of excessive force may be found to be an unlawful manner of committing the lawful act of self-defense/defense of another." Further, the jury was given a separate self-defense instruction. The jury did not find that Robinson acted in self-defense or imperfect self-defense. An instruction on voluntary manslaughter would not have changed this outcome, and the trial court did not err in not giving this instruction.

## CONFESSION

The confession in question was obtained as follows:

Once Robinson struck Crowley in the head with the golf club, he immediately ran home. After changing clothes, Robinson returned to the park with his mother, his mother's live-in boyfriend, Tony Jennings, and at some point his grandmother. Robinson approached the law enforcement officers and was directed to Detective Greg Davis. Robinson was not a suspect and Davis had no

information that would lead a reasonable person to suspect Robinson was anything other than an eyewitness.

Davis interviewed Robinson in Davis' car. Robinson's mother stood outside the car door and Jennings was close by. Davis asked Robinson for preliminary background information, including his name, age, and address. Davis then asked Robinson what he had seen earlier that evening. Robinson told Davis about the altercation between the boys and Crowley, and then Robinson said, "I ran up behind the guy and hit him with a golf club." After Robinson made this statement, Davis advised Robinson and his mother of Robinson's *Miranda* rights. Robinson and his mother indicated that they understood these rights, and Robinson signed a *Miranda* waiver form. Davis then asked Robinson if he wished to answer any more questions. Robinson's mother said, "I don't think we want to answer any more questions." Davis asked Robinson and his family to stay at the park. They agreed to do so and went to their van to wait. Robinson testified that he thought he was under arrest and was not free to leave the park after Davis read him his rights. Robinson reached this conclusion because he thought a person was under arrest before a person's rights were read.

About 1 hour later, Rick Geist, an Ottawa police officer, contacted Robinson, who was still waiting at the park with his family. He took Robinson and Jennings to the police department. Robinson's mother did not accompany Robinson to the police station because she took her mother home and then went to the police station. Geist knew that Robinson had already made an oral statement, and Geist had been instructed to interrogate Robinson further. Once at the police station, Delbert Hawel, of the Kansas Bureau of Investigation, arrived to help with the questioning. Geist informed Robinson and Jennings of Robinson's *Miranda* rights. Robinson indicated that he understood these rights. Robinson signed a *Miranda* waiver form and agreed to speak with the officers. Jennings was present during this time. Prior to any substantive questioning, Robinson's mother arrived at the police station and joined Jennings and her son in the interrogation room. She remained in the room throughout the interrogation. The police told her that her son had been advised of his *Miranda* rights. At this

time, Robinson's mother did not object to having her son speak with the law enforcement officers. At trial, Geist said he did not know that Robinson's mother had requested that the questioning stop at the park. According to Geist, if he had known that Robinson's mother had made such a request, he would not have proceeded with the questioning at the police station.

The interrogation at the police station was videotaped. During the interview, Robinson made the same incriminating statements that he had made at the park. The State admitted the videotaped interrogation at trial and Robinson objected, alleging that the questioning had occurred after his mother had asserted his right to remain silent and his right to an attorney. The trial court overruled the objection and admitted the videotape.

On appeal, Robinson does not challenge the introduction at trial of the statements he made at the park before he was given his *Miranda* warnings. Robinson does not challenge the admission of the second statement at trial based on the fact that he had made a previous similar confession at the park without first having been read his *Miranda* warnings. Robinson challenges the introduction at trial of the second statement because it was taken only an hour after his mother had previously invoked his right to remain silent and not to be questioned any further.

In *State v. Lewis*, 258 Kan. 24, 32-33, 899 P.2d 1027 (1995), we discussed the importance of the United States Supreme Court decision, *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), on the issue of the admissibility of a defendant's statements made after the defendant had invoked the right to remain silent:

"In *[Michigan v.]Mosley*, [423 U.S. 96,] the Supreme Court found that the admissibility of an incriminating statement obtained after a person in custody had initially decided to remain silent and later gave an incriminating statement depended upon whether the person's right to cut off questioning was scrupulously honored by the police. Mosley was questioned about a robbery; he exercised his right to silence after being advised of his *Miranda* rights. The police ceased interrogation. Hours later, a different police officer interviewed the defendant about a homicide [a different crime]. The officer re-*Mirandized* the defendant and the defendant made an admission. 423 U.S. at 97-98. The *Mosley* court addressed

whether the second interview violated the defendant's prior exercise of the right to remain silent. . . .

. . . .

"The *Mosley* court found that the statement of an accused made during custodial interrogation after invoking the right to remain silent will only be admissible when the suspect's right to terminate questioning has been 'scrupulously honored.' 423 U.S. at 104. The Court used these circumstances to analyze whether Mosley's right to remain silent had been honored: Police told Mosley prior to the first interview he was under no obligation to answer questions and could remain silent; Mosley stated he understood his *Miranda* rights and signed a *Miranda* form; the initial interview ceased upon Mosley stating he did not want to talk; two hours elapsed between the interviews, and *Miranda* warnings were again read to Mosley prior to the second interview; the second interview focused solely on a different crime than that discussed in the first interview. 423 U.S. at 104-06.

"The Court's analysis placed great emphasis upon the fact Mosley had received *Miranda* warnings prior to each interview. See 423 U.S. at 106-07. . . . The Court found that under the circumstances, Mosley's constitutional rights had been honored and his statements were admissible. 423 U.S. at 107.

"The issue in Mosley was whether the conduct of the police that led to Mosley's incriminating statement violated the *Miranda* 'guidelines,' established to protect a person's constitutional privilege against compulsory self-incrimination, so as to render the statement inadmissible in evidence against Mosley at his trial. 423 U.S. at 100. It was held Mosley's incriminating statement did not violate *Miranda* principles. 423 U.S. at 107.

. . . .

'To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, [no] passage . . . in the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

'A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. . . ." 384 U.S. at 479. The critical safeguard . . . is a person's "right to cut off questioning." *Id.*, at 474.

Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored." ' 423 U.S. at 102-104." *State v. McConico*, 4 Kan. App. 2d 420, 423-24, 607 P.2d 93 (1980).

In finding that Mosley's invocation of his right to remain silent had been scrupulously honored, the *Mosley* Court stated:

"This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. at 105-106.

In *State v. Law*, 214 Kan. 643, 522 P.2d 320 (1974), this court addressed the *Mosley* situation and adopted the *Mosley* rule. In so holding, the court stated:

"We recognize, of course, the teaching of *Miranda* that law enforcement officers are not to be permitted to attempt in-custody interrogation and if met by a refusal to return the defendant to jail and then repeat the procedure periodically until a statement is obtained. However, we do not stretch this prohibition to invalidate a statement given after an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent is knowingly and intelligently made. . . .

. . . .

"[In] the instant case, when the police received a 'no' answer at the station house, following defendant's arrest; according to his own testimony, the interrogation was immediately dropped and defendant was put in jail. This served to put defendant on notice that all he needed to do to halt interrogation was to give a negative response." 214 Kan. at 648-49.

Thus, the *Law* court held that the challenged statements were admissible. 214 Kan. at 651.

Based on *Miranda* and *Mosley*, if a defendant invokes his or her right to remain silent, the interrogation must stop immediately and

the right must be scrupulously honored. This does not mean an interrogation resumed at a later time is invalidated if the defendant knowingly and voluntarily waived the right to be silent at this later time and the defendant's right to be silent was scrupulously honored while it was invoked. *State v. Kanive*, 221 Kan. 34, 37, 558 P.2d 1075 (1976).

In this case, Davis informed Robinson of his *Miranda* rights, with his mother and Jennings present, and Robinson (through his mother) invoked his right to remain silent. Upon invocation of this right, Davis immediately stopped questioning Robinson. One hour later, Robinson was re-*Mirandized* at the police station by different officers with Jennings present. Robinson acknowledged that he understood these rights and stated that he was willing to make a statement anyway. Robinson made a statement, with Jennings and his mother present, which incriminated him. The question is whether the interrogation, after Robinson had invoked his right to remain silent, violated his Fifth Amendment rights.

Intertwined with the above issue is the fact that Robinson was a juvenile, 14 years of age. This court has previously held that a confession is not inadmissible merely because the person making it is a juvenile; however, a juvenile's confession requires courts to use the "greatest care" in assessing the validity of the confession. *State v. Young*, 220 Kan. 541, 553, 552 P.2d 905 (1976). Consideration is given to the totality of the circumstances and great reliance is placed upon the finder of fact. Here, the adult persons closest to Robinson were present and were aware, from the park interview, that if Robinson exercised his right to remain silent, his request would be honored. Robinson, his mother, and the man who had acted as a surrogate father to Robinson all appear from the record to be of at least average intelligence. The questioning was done in good faith in that the interrogating officer at the police station was not aware Robinson had previously exercised his right to remain silent at the park.

We conclude that the trial court's determinations concerning the confession are supported by substantial competent evidence when viewed as set forth above. Therefore, the trial court did not err in admitting the second confession into evidence.

Even if the admission of the second confession were considered error, it would be harmless error. Robinson made the same incriminating statements in his first confession at the park that he made in the second confession at the police station. The admissibility into evidence of the first confession in the park, through the testimony of the officer who conducted the park interview, is not challenged. There were several eyewitnesses who testified that Robinson ran up behind Crowley and struck him in the head with sufficient force to embed the golf club in Crowley's head causing his death. Thus, the second confession is merely cumulative and at most would be considered as harmless error beyond a reasonable doubt.

## COMMENTS IN CLOSING ARGUMENTS

There was no evidence that the killing of Crowley was related to street gang activity in any way. Nonetheless, during closing argument, the prosecution referred to the group of boys who Crowley approached in the park as "Jeremy Hendrickson's gang." Later, the following exchanges occurred during the State's closing argument:

"MR. DUNBAR [prosecutor] . . . [Crowley] went down there to give [the boys] the scolding that they deserved and somebody else should have been doing, but he took it upon himself to do it, right or wrong, he did it, should he be killed for that, that is what they want you to believe. Should he have died for that, should he have a golf club put in his head for that, for confronting these four young *Jeremy Hendrickson gang guys?*

"MR. BARKER [defense counsel]: Your Honor, I object to that, there is no proof that this defendant is a member of any Jeremy Hendrickson gang.

"THE COURT: I will sustain the objection. I think the jury should disregard— and not try to make any inferences that the defendant is a member of any gang." (Emphasis added.)

Further, the prosecutor stated:

"They're whacking him and Mr. Crowley is mad, he is mad the whole time. He is mad that these guys were beating up his boys. He is mad because they were taunting him. He was mad because they pulled a knife.

"MR. BARKER [defense counsel]: Objection to the reference as to they [were] beating up his boys.

"MR. DUNBAR [prosecutor]: It is a group, Your Honor. It is a gang.

"THE COURT: I will sustain the objection."

In Robinson's closing argument, his counsel attacked two of the State's witnesses as "coming out of the woodwork" because the witnesses did not initially come forward and report what they apparently saw. In response to this argument, the prosecutor stated in his rebuttal closing argument:

"MR. DUNBAR: Well, they told you they were scared of what they saw, they knew what they saw, they are in school, they know who Jeremy Hendrickson and those guys are. Isn't it reasonable—

"MR. BARKER: Object to those guys.

"THE COURT: Okay, I think I will sustain the objection and instruct the jury that they should not base their decision in this case based on any inferences that the defendant was a member of some organized gang."

The defense counsel moved for a new trial based on the State's closing argument, alleging that the comments which implied Robinson was in a gang that had beaten up Crowley's sons were highly improper and prejudicial.

In analyzing the issue, the trial court stated:

"There [are] two portions of this really, one is reference to the gang and [defense counsel] is correct, there was no evidence that Mr. Robinson was a member of any gang. And also the references to the fact that somebody beat up Mr. Crowley's son, that was never in evidence and any reference to that was a reference or an argument that was not based on the evidence. And so, probably that was one that I should have sustained the objection and should have instructed the jury that there was no evidence before them that someone had beaten up his boys and that there was no evidence that Mr. Robinson was a member of a gang. I think I adequately instructed them and cautioned them that they were not supposed to infer in any manner that Mr. Robinson was a member of a gang. And by telling them that, they should not make that inference. I think I made it clear that there was no evidence that he was a member of a gang, but I probably should have gone further and indicated that there was no evidence of, that anyone had beaten up Mr. Crowley's son in the trial of this case.

"In ruling as to whether that justifies a new trial, improper remarks of the prosecutor are grounds for reversal and a new trial only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. Also if there is error of constitutional magnitude in violating the defendant's constitutional rights, that is harmless error if I believe beyond a reasonable doubt that any error did not contribute to the verdict. I would find that the prosecutor's remarks in this case were not so gross and flagrant as to deny

Mr. Robinson a fair trial and I would also find that if I made any error in instructing the jury, that it did not contribute to the jury's verdict."

On appeal, Robinson asks for a new trial, due to the improper gang comments, alleging that the purpose of the comments was to incite and inflame the passions of the jury because random gang violence is widely feared. While the trial court found that comments were not supported by evidence and thus were not prejudicial, Robinson contends that this analysis overlooks the inherently inflammatory nature of the comments. Further, Robinson contends that the comments justify a new trial because, according to Robinson, the prosecutor purposefully interjected the comments into argument, even after the trial court had sustained defense objections on the issue.

The State contends that the prosecutor's gang comments in closing argument were not prejudicial because the prosecutor was simply making a reasonable inference, using the considerable latitude that a prosecutor is allowed, that the boys were in a generic gang, as opposed to a street gang, based on the testimony presented at trial. See *State v. Moody*, 223 Kan. 699, 705, 576 P.2d 637 (1978), *cert. denied* 439 U.S. 894 (1978). The State also argues that even if the gang comments were prejudicial, Robinson is not entitled to a new trial because the trial court gave the jury a curing admonition. The trial court told the jury during the State's closing argument to disregard the prosecutor's comments about a gang.

Finally, even if the gang comments were prejudicial and were not cured by the trial court's jury admonition to ignore the comments, the State argues that the comments were harmless error. The State points to evidence which shows Crowley was killed by a golf club blow to the head. Robinson did not deny that he was the one who dealt the deadly blow. The State's medical expert testified that the blow from the golf club was aimed at Crowley's head. Finally, the State points out that some evidence indicates the friend that Robinson was trying to protect was out of harm's way when Robinson hit Crowley in the head. Thus, the State asserts that the evidence against Crowley was so overwhelming that the gang comments had little, if any, likelihood of changing the result of the trial.

As such, the State contends that the comments qualify as harmless error and do not justify a new trial for Robinson.

Although the prosecution is given wide latitude in language and in manner of closing argument, the prosecutor must abide by the evidence and refrain from speech designed to inflame or prejudice the jury. *State v. Duke*, 256 Kan. 703, 718-20, 887 P.2d 110 (1994). Further, error may be cured by a trial court's admonition to the jury that it disregard a prosecutor's prejudicial statements. *State v. Pursley*, 238 Kan. 253, 265, 710 P.2d 1231 (1985) (quoting *State v. Perales*, 220 Kan. 777, 780, 556 P.2d 172 [1976]) (" 'Improper remarks made by the prosecuting attorney in his summation to the jury will not provide a basis for reversal where the jury has been instructed to disregard the same, unless the remarks were so prejudicial as to be incurable.' "). In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt. *State v. Gibbons*, 256 Kan. 951, 963-64, 889 P.2d 772 (1995) (citing *State v. Zamora*, 247 Kan. 684, 690, 803 P.2d 568 [1990]).

The prosecutor's gang comments during closing argument implied that Robinson was in a street gang which participated in violent acts. There was no evidence to support the fact that Robinson was in fact in such a gang. Thus, the comments were in error, especially those which the prosecutor made after the trial court had sustained Robinson's objection to comments and had put the State on notice not to use the term "gang" again.

However, the comments constituted harmless error. The trial court instructed the jury to disregard the comments. There is no reason to believe that the jury was not able to abide by the trial court's admonition and not give the comments any weight since they were not supported by evidence. Further, Robinson admitted that he killed Crowley by hitting him in the head with a golf club. The only question the jury had to decide was whether Robinson acted in self-defense, with recklessness, or with extreme recklessness. The jury found Robinson acted with extreme recklessness, and there was evidence to support this. The State's medical expert

testified that the golf club was aimed at Crowley's head, and there was testimony that Robinson's friend was no longer in danger when he hit Crowley in the head. Further, the gang comments constituted just a few words out of a 4-day trial. See *State v. Aikins*, 261 Kan. 346, 932 P.2d 408 (1997) (finding that a two-line reference to gangs out of a 2-week trial was not so prejudicial as to justify a mistrial, even if the comments were made in violation of an order in limine). It is clear beyond a reasonable doubt that the improper gang comments had little, if any, likelihood of changing the result of the trial. Thus, the comments qualify as harmless error, and Robinson is not entitled to a new trial on this issue.

Affirmed.

LOCKETT, J., concurring in part and dissenting in part: I respectfully concur in the result but dissent from the majority's finding that (1) Robinson's confession was admissible under *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), and (2) the trial court's determination to admit the confession was supported by substantial competent evidence. In *Mosley*, the Supreme Court interpreted *Miranda* to require some cessation of the interrogation once the accused has invoked a *Miranda* right and to "scrupulously honor" those rights once asserted. In *State v. Newfield*, 229 Kan. 347, 354, 623 P.2d 1349 (1981), quoting from *Mosley*, we stated:

" 'To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles. . . .

" 'A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. . . ." [Citation omitted.] The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." ' pp. 102-03."

In this case, the minor's mother asserted his right to silence during the first interrogation. One hour after the assertion of this right, Robinson was transported to the police station and was interrogated again in his mother's absence. The 14-year-old received another *Miranda* warning and agreed to speak with Officer Geist. A KBI agent, who was aware that Robinson's mother had asserted his right to silence, was also present. Robinson was not interrogated about an unrelated crime, as was the case in *Mosley*. When Robinson's mother appeared after the second interrogation had begun, she was presented with *a fait accompli* and informed that her son had already waived his *Miranda* rights.

Unfortunately, the majority opinion contains no discussion of the factors relied upon by the trial court in admitting the statements made by Robinson during the second interrogation. Thus, it is difficult to discern the basis upon which the majority concludes that the trial court's decision was supported by substantial competent evidence. In any case, the circumstances of the second interrogation are fundamentally unfair and reveal that defendant's right to silence was not scrupulously honored as required by *Mosley*.

If the admission of the confession was a violation of the defendant's right to remain silent, how can I concur in the result? Review of the admission or the exclusion of evidence is governed by the harmless error rule. K.S.A. 60-261 provides that no error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. *State v. Thompson*, 221 Kan. 176, 183, 558 P2d 93 (1976).

I concur with the majority that under the circumstances, the evidence of guilt is of such direct and overwhelming nature that the confession, although erroneously admitted in violation of Robinson's constitutional rights, could not have affected the result of the trial; therefore, such admission was harmless.

ALLEGRUCCI and SIX, JJ., join in the foregoing concurring and dissenting opinion.